Good morning. Good morning. May it please the Court, Katherine E. Ruhle for the petitioner, Natalie Burke. You may proceed. Thank you. There are two distinct issues presented to the Court in this case. The first has to do with a due process claim regarding the denial of a continuance of a U visa. The other with the denial of protection under the Convention Against Torture. In the interest of time, I wanted to first address the due process claim. We recently notified this Court that the U visa that was the basis of the request for the continuance has since been denied. It has also been denied on the merits. There is no appeal pending. In light of this, we recognize that that issue is likely moot. We would, of course, note that the denial of the U visa application by the Citizenship and Immigration Services doesn't necessarily mean that she's not able to file another application for a U visa. But at this point, there is not one filed. Kennedy Wasn't there a previous one filed before this one that just got denied? Loretta E. Lynch Yes. So there was originally an application filed when the petitioner was in front of the immigration judge. And that application was actually denied in 2011, I believe, or potentially a little after. I'm sorry. Actually, I might have the, no, sorry. It was filed in 2011. It was denied. And then another application was filed based on the certification that our office received in 2013, just days before the opening brief was due. And we submitted it with a motion for judicial notice. A new application was submitted with that certification. There was ample litigation of that application, and it was ultimately denied in 2014. At this point, there's no appeal pending or another application filed. Kennedy So you do acknowledge that under the circumstances that issue is likely moot then? Loretta E. Lynch Yes. In light of that, I'd like to move on to the Convention Against Torture claim with the remaining time. In this case, the agency rested its denial of Convention Against Torture exclusively on the issue of whether the torture was more likely than not. The agency found that there was not a likelihood of torture, and that was really the entire basis of their analysis. So I would like to focus on that issue specifically. The error in the agency's denial, first, they didn't give substantial reason to consideration to all of the evidence. But more significantly, under Cole, they failed to consider the aggregate effect of two different potential sources of torture. In this case, we would note that the Board purports to address that issue. The IJ does not, but the Board does purport to address the argument that was raised on appeal and say that the judge did consider both claims, but they don't actually substantially consider that argument. They just basically state that they are considering the argument and go on to refer to the judge's decision, again, that both claims were essentially speculative. But they don't engage in a reasoned analysis of the evidence in both cases and then decide if the aggregate effect of both does rise above the more likely than not standard. But your client bears the burden of proof, does she not? Yes, she does. And in this case, my understanding is that both the IJ and the BIA concluded that although she says she has certain fears and she talks about certain people that might be certain places, it is speculative. Right. Isn't that sufficient for the Board to confirm the IJ's decision regarding credibility? Well, this Court has held in Hale v. Holder that, yes, a claim can't be entirely speculative. Of course, the Board has set out in, I think it's a matter of JFF, the decision that, you know, a claim can't be based on a series of suppositions, all of which are speculative. But this case is above — it rises above that standard. I mean, in Hale, basically this Court said that the agency can't simply recast substantial evidence as speculative and then use that as a manner to avoid having to engage in a reasoned decision of the actual facts. Where is the substantial evidence, though, on your client's part with respect to torture? Well, in this case, her testimony was found credible, and that is the most significant evidence presented in the case. It's not about future, right? Right, yes. It's, well, you can take reasonable inferences from evidence about what may happen in the future. And a number of cases have been granted for Convention Against Torture, even though they're prospective in nature. Cole itself is a case in which there was no past torture and the applicant had actually not experienced anything in the home country, nor did they have any direct threats, unlike the case in this — in Petitioner's case, there actually were direct threats. And that's actually the evidence that we believe the agency failed to consider adequately. As I noted, Respondent's testimony was found credible. The evidence that she testified to is not contested on appeal, and so that has to be given reasoned consideration, along with reasonable inferences. And there's a distinction between reasonable inferences and speculation. What — excuse me, Counsel. What were the direct threats to your client for purposes of future torture? Yes. She — it was basically after she acted as an informant against Mr. Michael McCullough. Right. You know, she volunteered with the FBI, and he was arrested, convicted, and sentenced. After that, she received phone calls. And the judge does note in his decision the fact that she received phone calls threatening her from various parties associated with Mr. McCullough. But in addition to that — and the agency doesn't note this, I believe — she was also — received numerous text messages, and she received in-person threats. She testifies to being in a hair salon when an associate of Mr. McCullough came in and threatened her directly. He said, we know you're a snitch. We know you're the one responsible for Mr. McCullough's incarceration. And you're not going to get away with this. We are going to get you. And the agency didn't discuss that in-person live threat. It's also significant that those threats were made over a span of time, and despite the fact that she attempted to move — she moved at one point to Florida, moved back thinking the threat was gone. The threats continued. She moved to another home. The threats continued. So there's a substantial — The threats were in the United States. Those threats were in the United States, but they're not speculative. She doesn't engage in speculation. She's careful to be honest about what she doesn't know. But what she does know constitutes substantial evidence, and that needs to be given adequate weight. The other thing that's important that I don't think the agency addresses adequately is the fact that she has a connection to Mr. McCullough beyond their brief relationship. She notes several times to the judge that — I believe it's a family relationship. Sounds attenuated, but it's not. Her son on the father's side of the family is related to Mr. McCullough via his daughter. There's a connection between her children and his children. And that family was watching her very closely and was aware of the fact that she was responsible for Mr. McCullough's arrest. And she believed — and I think she testified with good reason — that they would inform Mr. McCullough of her whereabouts. So that's not speculation. I think that's direct evidence that if she was returned to Jamaica via deportation, that they would communicate that with Mr. McCullough. Counsel, back to the jurisdictional issue, you noticed that the government has made a new sua spontean bank call with respect to, well, Penjikoff, among others. What's your response? We don't think that that — we think that that question has been raised numerous times to this Court and adequately answered. This Court's — let me just check my notes. Of course, this Court in Lemus Gallivan v. Mukasey addressed that, and it's repeatedly been raised again. I believe in Morales-Gonzalez, 478 F. 3rd, 972, 980, 9th Circuit, 2007. And then again in Arteaga v. Mukasey, again in 2007, the government again raised those arguments. And — Well, I think the government is focusing on the concurring opinion of Judge Graber in Penjikoff. Are you familiar with that? Right. Yes, I am. Yes, I am. Well, she raises a significant issue. That was not the right vehicle, in her view. But what about the merits on that? Well, Your Honor, all I would say on that at this point is that we believe that the Court has addressed it in numerous decisions, and it wouldn't be — it wouldn't be necessary to go en banc on this issue and not in this particular case. Very well. Thank you, counsel. Would this case — would this case be any more on the merits than Penjikoff would have been? I don't know, honestly, Your Honor, if I'm prepared to answer that question. Thank you, counsel. You have 20 seconds to reserve, if you wish. Yes, thank you. We'll hear from the government. You may proceed, counsel. Good morning, Your Honors. May it please the Court, my name is Juria Jones. I represent the Attorney General of the United States. As Petitioner's counsel noted, there are two issues before this Court. But as Judge Smith recognized, that the issue of the motion of a continuance may be moved. So I will focus my argument, and if the Court has questions for me, I'm willing to answer this, but I'll focus my argument on whether or not the evidence compels a contrary conclusion to that reached by the agency that Petitioner established her entitlement to protection under the Convention Against Torture. Particularly with regards to that, the evidence does not compel a finding that Petitioner would be tortured if returned to Jamaica. She mentioned in her opening brief that there were two sources — possible sources of torture. And in argument, she focused on the particular one involving her acting as an attorney in 2001. However, she provided insufficient evidence to show, by clear probability, that she would face torture if returned to Jamaica, based upon her role in that activity. She testified on page 176 and on page 190 of the record, that she does not know where this individual is. She's unsure whether or not he's even in Jamaica. And she testified again on page 191. She herself has never received threats directly from this individual in the first place. So, again, it is clear speculation that if she is returned to Jamaica, she would suffer torture. And this is, again, it's very important to emphasize that we're talking about torture, not just some sort of harm or harassment, but that she would be tortured by or with the consent or with the acquiescence of the Jamaican government. Isn't that the big issue here, that clearly she's concerned about the threats that she has received in the United States. But I'm having trouble finding any evidence that she would face the likelihood of torture either by the government in Jamaica or by someone with the acquiescence of the government in Jamaica. Is the government aware of any evidence that would suggest that anybody in the government of Jamaica or the government itself would want to torture her? Is there any evidence at all in the record? No, Your Honor. And Petitioner's counsel pointed out that it is their belief that the immigration judge didn't talk about the aggregate effect. But the immigration judge and the board did talk about the aggregate effect. Particularly, they talked about the aggregate effect of her possible two sources. On page 94 of the immigration judge's decision, I mean, which is on page 94 of the record, the immigration judge specifically talked about the fact that the Jamaican government is making efforts to fine and detain and prosecute criminals. And this individual that she informed with the FBI, she herself said that this individual's engaged in criminal activity. So she's provided no evidence that the Jamaican government would acquiesce if this individual or would consent if this individual, if he's in Jamaica, and if he decided to torture her, she provided no evidence to support that as well. So it's the government's position that whatever threat she may be under has nothing to do with the government. There's no evidence here suggesting the government is acquiescing or that the government is just letting crime go so unpunished that this guy can act freely without any restraint. That's correct. And actually, the record evidence actually indicates the contrary. And so based upon it's her burden to prove that the evidence compels a contrary conclusion, she's unable to do so. I don't, she didn't discuss the other source with regards to her father's political affiliation, particularly the fact of the matter that she herself testified that she's unsure of what actually was the cause of her father's death. She, on page 199 of the record, she says, and I quote, there could be a million reasons why he died. So she doesn't even know herself whether or not his political affiliation. And again, the immigration judge and the board, again, considering the aggregate effect of potential sources, indicated that her father's political party was now the governing party. That party's leader was in the prime minister of Jamaica. And so therefore, and then also the immigration judge noted in his decision that the Jamaican government is making efforts to find and pick up any potential corrupt police officers, which she speculated may or may not have been involved in her father's death. Yes, Your Honor. Counsel, if you're through on that issue. Yes, I am. You heard my colloquy with Ms. Ruhle about the suggestion from the government that we do a sua spontean bank on the Penjikoff issue. In light of your 28-J letter referring to Garcia, what's the government's position now? The government preserves its objections to the Garcia holding, and we continue to preserve our objections to this court's holding in various cases that there's jurisdiction in this issue, particularly in light of the fact that there's the criminal bar at 1252 A2C, which bars review, which bars jurisdiction over review of any final order of removal of an alien who's removed by reason of having committed an aggravated felony. And in this particular case, Petitioner has never challenged the IJ's dispositive decision that she's an aggravated felon. She actually waived that issue before the board. It's not pending before this court. So this would be a proper vehicle to reexamine the jurisdictional issue in that particular case, particularly in light of the fact that those issues of her removability aren't being challenged. I assume you're familiar with Judge Graber's concurrence in Penjikoff? Yes. She felt that was not the right vehicle. What would – how would you distinguish the Penjikoff case from this case in terms of this being potentially the right vehicle? I would like an opportunity, if the Court would like, to further examine that issue. I have – I'm familiar with the Penjikoff, but at this point I can't remember the factual distinctions of it. But why this is a particular valuable vehicle in that sense is because the only issue is the deferral. We're not talking about an issue about whether or not – in this particular issue, the merits of the deferral actually can't go to her being an aggravated felon. So the analysis wouldn't quite make sense that you could only not review a deferral decision by the board unless it's involving the grounds of removability. Here, grounds of removability aren't being contested. So she has waived that. So both parties are in concurrence that she is removable for her drug conviction. So in that sense, it's almost – it would be a very interesting logic to follow to try to determine that the grounds of deferral for removal would have any sort of remote link to her grounds of removability, which is why this would be an excellent vehicle for that jurisdictional issue to be reexamined. I'm puzzled, frankly. The reason why Judge Graber thought that Petrichoff was not the proper vehicle to deal with the issue was because it wasn't necessary to decide that case on the merits. Is the government's position that unless we take that case on, on bunk, that we can't decide this case on the merits? Oh, no. That's not our position at all. We preserve the issue, as we have preserved the issue in a number of briefs. So that's not our position. If this Court determines that, you know, you have your jurisdiction to determine your jurisdiction, you could actually decide that. So this case is really not any different than Petrichoff in the sense that it's not necessary to decide the issue you'd like us to decide in order to decide this on the merits in the government's favor? Well, the only thing would be is what we preserved in our jurisdictional statement is the fact that this – the Ninth Circuit and the other circuits are split on this issue, and we've noted our objections to the fact that we believe that the criminal bar does bar review of the merits. However, in light of the fact that you can decide your own jurisdiction, absolutely you could decide this on the merits of the case if you felt that that was – Would this case be decided any differently, or the result in this case be any different if we went on the jurisdictional bar route versus the merits route? In terms of our winning or losing, I guess you could say? No, Your Honor, because she provided insufficient evidence to determine that the record evidence compels a contrary conclusion. I may be misunderstanding your question. As between different theories which would prevail – in which the government would prevail, what would the government prefer? We would prefer that it would be dismissed on the jurisdictional ground. We would. We would prefer that, correct. On both issues, on the continuance and – Well, the continuance is moot, is it not? Well, in light of Garcia, correct. And in light of the fact that she's now – it's been denied twice, then it's moot. But, yes, we would prefer that it's decided on the jurisdictional grounds. Anything further? No, nothing, Your Honor. Thank you, counsel. Thank you. On this rule, you have a few seconds left. I would just quickly note that on the acquiescence issue, that the board – neither the board nor the IJ rested their decision on acquiescence. They didn't engage in an analysis. So I don't know that it would be proper for the Court to engage in that analysis now. The decision rested entirely on the more likely than not. We would notice on acquiescence also that this Court has held that acquiescence doesn't require, in magic all beholder, that the entire government or that the official government acquiesce, but that it can be government officials, and that you need to consider whether government officials would acquiesce. And the evidence in the country report – and the judge notes this as well – does indicate that there is a serious epidemic in Jamaica of police violence, extrajudicial killings by the police. And that's a big concern for the petitioner. She does note in her testimony on the claim regarding her father's death that there were some very concerning circumstances where a police officer showed up at her family home to inform the family that he had died. And when the family arrived at the scene, the first responders still didn't know who her father was, who the person who died was. So there seems to be an implication there, a reasonable inference, that a police officer may have been involved. Very well. Thank you, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Fernandez, M. Smith